# EXHIBIT B

TRANSPORTATION BROKER – MOTOR CARRIER AGREEMENT

This Agreement is entered into this _6_ day of __June__, 201_4_, by and between HONOR WORLDWIDE LOGISTICS, LLC (hereinafter referred to as "BROKER"), a property transportation broker registered with and operating under property transportation broker Permit No MC 844597 issued by the Federal Motor Carrier Safety Administration or its predecessor within the U.S. Department of Transportation, and _ART Heavy Haul INC_ hereinafter referred to as "CARRIER") a for-hire motor carrier registered with and operating under for-hire motor carrier authority Certificate/Permit No. MC _733a222_ issued by the Federal Motor Carrier Safety Administration or its predecessor within the U.S. Department of Transportation, collectively, the "Parties" and individually a "Party".

1. **CARRIER RFEPRESENTS AND WARRRANTS THAT:**

   A. It is a motor carrier of property authorized to provide for-hire motor carrier transportation of property under contract with shippers, consignors, consignees, brokers and/or property transportation brokers of general commodities.

   B. It shall (except as otherwise provided in the Agreement) transport the shipments of property tendered to CARRIER by BROKER, under CARRIER'S own operating authority and subject to the terms of this Agreement.

   C. It makes the representations contained in this Section 1 of this Agreement for the purpose of Inducing BROKER to enter into this Agreement.

   D. It agrees that a shipper's or consignor's Insertion of BROKER'S name as the carrier on a bill of lading shall be for the shipper's or consignor's convenience only, and shall not change BROKER'S status as a (the) property transportation broker nor CARRIER'S status as a (the) motor carrier.

   E. It shall not re-broker, assign or interline the shipments under the Agreement, without prior written consent of BROKER; if CARRIER breaches this provision, BROKER shall have the right of paying the monies it owes CARRIER directly to the delivering carrier, in lieu of payment to CARRIER; upon BROKERS'S payment to the delivering carrier, CARRIER shall not be released from any liability to BROKER under this Agreement; and in addition to the indemnity obligation in paragraph E of Section 3 of this Agreement CARRIER shall be liable for consequential damages for violation of the paragraph E of this Section 1 of this Agreement.

   F. It is in, and shall maintain compliance during the term of this Agreement, with all federal, state and local laws applicable to the provisions of its services including, but not limited to: transportation of Hazardous Materials, (including the licensing and training of drivers), as defined in 49 C.F.R. §172.800, §173, and §397 el seq. to the extent that any shipments agreed to be transported by CARRIER, under this Agreement constitute Hazardous Materials; owner/operator lease regulations, loading and securement of freight regulations; Implementation and maintenance of driver safety regulations including but not limited to , hiring, controlled substances, and hours of service regulations; sanitation, temperature and contamination requirements for transporting food and other perishable products, qualification, licensing and training of drivers; Implementation and maintenance of equipment safety regulations; maintenance and control of the means and method of transportation including, but not limited to , performance of its drivers.

Honor_000002

G. It agrees that the control of all of its drivers and owner operators, including but not limited to compliance with hours of service and hours of service logging is the responsibility of CARRIER; and CARRIER agrees to notify BROKER in writing if CARRIER'S driver or owner operator cannot complete delivery of a load on account of hours of service laws and regulations.

H. It shall notify BROKER immediately if CARRIERS' federal operating authority is revoked, suspended or rendered inactive for any reason, and/or if CARRIER is sold, or if there is a change in control of ownership of CARRIER and/or if any of its insurance required under this agreement is threatened to be or is terminated, cancelled, suspended, or revoked for any reason.

I. It does not have an "Unsatisfactory" or "Conditional" safety rating issued by the Federal Motor Carrier Safety Administration (FMCSA), U.S. Department of Transportation, and shall notify BROKER in writing immediately if its safety rating is changed to "Unsatisfactory" or "Conditional".

J. It authorized BROKER to include CARRIER'S freight charges in the invoice(s) which BROKER will send to the shipper, consignor, consignee or third parties responsible for payment to BROKER.

K. It has investigated, monitors, and agrees to conduct business under this Agreement based on the creditworthiness of BROKER and is granting BROKER credit terms accordingly.

L. It shall not seek any payment of its freight charges from BROKER's shipper customer(s), from any consignor(s) and/or from any consignee(s).

2. BROKER RESPONSIBILIES:

A. SHIPMENTS, BILLING AND RATES: BROKER agrees to tender to CARRIER at least one (1) shipment under this Agreement. BROKER shall inform CARRIER of (a) place of origin and destination of all shipments; and (b) if applicable, any special shipping instructions or special equipment requirements, of which BROKER has been timely notified.

B. BILLING TO BROKER'S SHIPPER CUSTOMER: INVOICE FROM CARRIER: BROKER agrees to conduct all billing to BROKER'S shipper customer or other party who is responsible for payment to BROKER of BROKER'S charges (which will include CARRIER's charges). CARRIER shall invoice BROKER for CARRIER's rates and charges (which may include but are not limited to charges for transportation , stop-offs, detention, loading or unloading, fuel, or other accessorial charges) incorporated into this Agreement by reference, or as mutually agreed upon in wiring between BROKER and CARRIER in a load confirmation sent by BROKER to CARRIER by fax or email and accepted by CARRIER by fax or email to BROKER, which load confirmation shall thereupon be deemed incorporated into this Agreement by reference.

C. PAYMENT TO CARRIER:

I. The parties agree that BROKER shall be the sole party responsible for payment of CARRIER's charges. Provided CARRIER is not in default under the terms of this Agreement, and except as otherwise agreed to in writing by BROKER and CARRIER, BROKER agrees to pay CARRIER's invoice within thirty (30) days of BROKER's receipt of the original bill of lading and proof of delivery showing CARRIER as the CARRIER of record, proof of delivery signature with any exceptions noted, CARRIER's invoice and any applicable receipts for assessorial charges which were agreed upon between BROKER and CARRIER in writing,

Honor_000003

including any original lumper receipts. Any exception(s) noted on the bill of lading may delay payment to CARRIER while BROKER awaits information from BROKER's shipper customer(s) and from CARRIER as to the nature of the exception(s). In order to determine the proper action to take. CARRIER hereby waives and releases any and all liens which CARRIER might otherwise have upon any shipment or cargo agreed to be transported by CARRIER under this Agreement, which CARRIER might otherwise have. CARRIER shall not withhold any shipment or cargo transported by CARRIER under this Agreement on account of any alleged failure of BROKER to pay any charges to CARRIER under this Agreement or on account of any dispute as to the charges alleged by CARRIER to be owed it by BROKER under this Agreement. If CARRIER holds any shipment or cargo hostage for payment of or increase in charges to be paid to CARRIER under this Agreement, CARRIER agrees to pay a fine of $1,000.00 per day to BROKER and agrees to pay BROKER for any attorneys' fees incurred by BROKER, BROKER's shipper customer(s) or the consignee(s) to recover the shipment or cargo. In the event CARRIER files any bankruptcy proceeding or has any bankruptcy proceeding filed against it, BROKER, BROKER's shipper customer(s), the consignor(s) and/or the consignee(s) shall be entitled to immediately enter upon any owned or leased property of CARRIER. Including a trailer, where the shipment or cargo belonging to BROKER's shipper customer(s), the consignor(s) or the consignee(s) may be found and shall be entitled to take possession of such shipment or cargo.

    II.    Payment and other disputes are subject to the terms of paragraph G of Section 4 of this Agreement, which provides in part that the prevailing Party is entitled to recovery of costs, expenses and reasonable attorney's fees.

   D.   <u>Bond:</u> BROKER shall maintain a surely bond or trust fund on file with the Federal Motor Carrier Safety Administration (FMCSA) in the form and in the amount required by the FMCSA's regulations.

## 3. CARRIER RESPONSIBILITIES:

   A.   <u>EQUIPMENT:</u> CARRIER agrees to provide all necessary clean and not contaminated truck and trailer equipment (hereinafter referred to as the "Equipment") in good and safe operating condition and lawfully qualified personnel to provide and complete the transportation services required for BROKER and BROKER's shipper customer(s). CARRIER shall not supply any Equipment that has been used to transport hazardous wastes, solid or liquid, regardless of whether they meet the definition in 40 C.F.R § 261.1. *el. Seq.* CARRIER agrees to fully inspect (including but not limited to a U.S. carrier DOT pre-trip inspection) the Equipment prior to use by CARRIER of the Equipment. CARRIER agrees that the Equipment shall at all times be road worthy and comply with all applicable safety laws, regulations and rules pertaining to road worthiness and safe operation of the Equipment. CARRIER shall and agrees to operate the Equipment in a safe and lawful manner. CARRIER agrees to pay for all maintenance and repairs required to the Equipment.

   B.   <u>TRANSPORT AND DELIVERY:</u> CARRIER agrees that each shipment shall be transported and delivered with reasonable dispatch, so as to meet the shipper's delivery schedules, or as otherwise agreed in writing by BROKER and CARRIER.

   C.   <u>BILLS OF LADING:</u> CARRIER shall issue the form of bill of lading to the shipper in compliance with 49 U.S.C § 14706, 49 U.S.C§ 80101 *el. Seq.*, and 49 C.F.R §373.101(and any amendments thereto), for the property CARRIER receives for transportation under this Agreement. The terms of such bill of lading are hereby incorporated by reference into this Agreement except to the extent the terms conflict

Honor_000004

with the terms of this Agreement. Unless otherwise agreed in writing by BROKER and CARRIER, CARRIER shall become fully responsible/liable for the freight when CARRIER takes/receives possession and/or physical tender thereof and the trailer is loaded, regardless of whether a bill of lading has been issued, and/or signed, and/or delivered to CARRIER by BROKER's shipper customer(s), and such responsibility/liability shall continue until delivery of the shipment to the consignee, and the consignee signs the bill(s) of lading or delivery receipt(s). Any terms of the bill(s) of lading (other than a government bill of lading) which conflict with the terms of this Agreement shall not apply. Failure by CARRIER to issue a bill of lading to the shipper or to sign a bill of lading acknowledging receipt of the cargo shall not affect the liability of CARRIER and the applicability of the terms of the form of bill of lading.

D.  **LOSS, DAMAGE AND DELIVERY DELAY CLAIMS:**

I.  CARRIER shall be fully liable for any and all cargo loss, damage or delivery delay.

   II.  CARRIER shall comply with 49 C.F.R § 370.1 *el seq.* and any amendments and/or any other applicable regulations adopted by the Federal Motor Carrier Safety Administration, U.S. Department of Transportation, or any applicable state regulatory agency, for processing all loss, damage or delivery delay claims and salvage.

   III.  CARRIER's indemnification liability (paragraph E of this Section 3 of this Agreement) for cargo loss, damage or delivery delay claims under paragraph D.I of this Section 3 of this Agreement shall include costs, expenses and reasonable attorneys fees which shall constitute special damages, the risk of which is expressly assumed by CARRIER.

   IV.  Neither Party shall be liable to the other for any indirect or consequential damages (such as, but not limited to loss of profits, loss of market, loss of customer goodwill, shutdown, or punitive or exemplary damages) without prior written notification of the risk of loss and its approximate financial amount, and the written agreement of the Party assume such responsibility.

   V.  Notwithstanding the terms of 49 C.F.R § 370.9, CARRIER shall pay, decline or make settlement offer in writing on all cargo loss, damage or delivery delay claims within thirty (30) days of receipt of the claim. Failure of CARRIER to pay, decline or offer settlement within this thirty (30) day period shall be deemed admission by CARRIER of full liability for the amount claimed and shall constitute a material breach of this Agreement.

   VI.  CARRIER's liability for cargo loss, damage or delivery delay from any cause under paragraph C and D.I of this Section 3 of this Agreement shall not exceed One Hundred Thousand Dollars ($100,000) per shipment, unless CARRIER agrees in writing by fax or email to BROKER to a higher liability amount.

E.  **INDEMINTY:** CARRIER shall DEFEND, INDEMNIFY AND HOLD BROKER and BROKER's shipper customer(s) and their employees, officers, directors, managers and agents HARMLESS from and against all claims, actions, demands, liabilities, losses, damages, fines, penalties, payments, injuries, death, costs and expenses (including, without limitation, costs, expenses and reasonable attorneys fees) caused by, resulting from and/or arising out of (I) the negligence or intentional misconduct of CARRIER or its employees, officers, directors, managers or agents, (II) CARRIER's or its employees', officers', directors', managers' or agents' violation of applicable laws, rules or regulations, (III) CARRIER's or its employees', officers', directors', managers' or agents' breach of this Agreement or (IV) CARRIER's or its employees', officers', directors', managers', or agents' performance of this Agreement.

Honor_000005

F. **INSURANCE:** CARRIER shall furnish BROKER with Certificate(s) of insurance, and insurance policies providing for thirty (30) days advance written notice of cancellation or termination, and unless otherwise agreed in writing, having the minimum limits and requirements of the Federal Motor Carrier Safety Administration, and the following minimum limits: public liability/auto liability, including hired and non-owned vehicles, covering personal injuries, death and property damages-One Million Dollars ($1,000,000) combined single limit per occurrence (Five Million Dollars ($5,000,000) combined single limit per occurrence if transporting hazardous materials including environment damages due to release or discharge of hazardous substances); commercial general liability- One Million Dollars ($1,000,000); comprehensive physical damage insurance covering CARRIER's truck(s) and trailer(s); all risks cargo damage and/or loss-One Hundred Thousand Dollars ($100,000) per shipment; and workers' compensation with limits required by law. In addition, the insurance policies shall comply with minimum requirements of the Federal Motor Carrier Safety Administration and any other applicable state regulatory agency. Noting in this Agreement shall be construed to avoid CARRIER's liability due to any exclusion or deductible in any insurance policy. CARRIER shall take such action as is necessary to have BROKER named as an additional insured in such insurance policies.

G. **ASSIGNMENT OF RIGHTS:** CARRIER automatically herby assigns to BROKER all of CARRIER's rights. If any, to collect freight charges from BROKER's shipper customer(s), the consignor(s), the consignee(s) or any responsible third party(ies) on receipt of payment from BROKER.

H. **COLLECTION OF CHARGES BY CARIER:** If BROKER's shipper customer or other party delivers to CARRIER (or its driver) any payment for freight charges of BROKER and/or CARRIER, CARRIER agrees to promptly deliver such payment to BROKER.

4. **MISCELLANEOUS:**

A. **AGREEMENT ENTERED INTO PURSUANT TO 49 U.S. CODE SECTION 14101 (b); WAIVER PURSUANT TO 49 U.S. CODE SECTION 14101(B):** To the extent this Agreement is applicable to U.S. DOT regulated interstate or foreign commerce shipments, CARRIER and BROKER agree that this Agreement is entered into pursuant to 49 U.S. Code Section 14101(b) for the purpose of providing and receiving specified services under specified rates and conditions. CARRIER, in connection with any U.S. DOT regulated interstate or foreign commerce transportation services to be provided by CARRIER under this Agreement, expressly waives pursuant to 49 U.S. Code Section 14101(b) any and all rights and remedies under Part B, Subtitle IV, Title 49, U.S. Code which are inconsistent with or conflict with any provision of this Agreement.

B. **CARRIER TO PROVIDE TRANSPORTATION TO BROKER'S CUSTOMER:** CARRIER and BROKER understand and agree that under this Agreement: (i) BROKER shall arrange for CARRIER to transport by truck one or more shipments for BROKER's customers, and, (ii) CARRIER shall provide such transportation to BROKER's customer(s).

C. **INDEPENDENT CONTRACTOR:** It is understood an agreed that the relationship between BROKER and CARRIER is that of independent contractor, and that no employer/employee relationship exists, or is intended. BROKER has no control of any kind over CARRIER, including but not limited to routing of freight, and nothing contained in this Agreement shall be construed to be inconsistent with this provision. By this Agreement CARRIER and BROKER do not intend to provide for division of profits between CARRIER and BROKER, to create any joint venture between CARRIER and BROKER, or to otherwise create a de facto or de jure joint enterprise or partnership between CARRIER and BROKER and any shipper.

D. SEAL ON TRAILER; NO ADDITIONAL CARGO WITHOUT PERMISSION: CARRIER agrees that neither it nor its driver, other employee, owner operator or agent shall break any seal on any trailer, add any addition cargo or combine the cargo of BROKER's shipper customer with the cargo of any other shipper unless written permission has been given by BROKER to CARRIER to do so regardless of the weight or the volume of the cargo. If the shipper, the consignor or agent of the shipper or the consignor loads and seals a trailer tendered without a representative of CARRIER inspecting and counting the cargo during the loading process, CARRIER shall not be liable for shortage, upon delivery of the trailer with the seal intact. CARRIER shall be similarly not liable for shortage, upon delivery if a seal was broken only at the direction and under the supervision of a United States governmental authority agent, and CARRIER applies another seal to the trailer under the observation of the governmental authority agent and notes the new seal number of the bill of lading.

E. NON-EXCLUSIVE AGREEMENT: CARRIER and BROKER acknowledge and agree that this Agreement does not bind the respective Parties to exclusive services to each other. Either Party may enter into similar agreements with other carriers or with other properly transportation brokers that do not conflict with the Parties' rights and obligations under this Agreement.

F. WAIVER OF PROVISIONS: Failure of either Party to enforce a breach of any provision of this Agreement or to otherwise waive a provision of this Agreement shall not be deemed to constitute a waiver of any subsequent breach of any provision of this Agreement, and shall not affect or limit the right of either Party to thereafter enforce a provision.

G. DISPUTES: In the event of a dispute between the Parties arising out of this Agreement, including but not limited to Federal or State statutory claims, the Party's sole recourse (except as provided below) shall be to arbitration. Proceedings shall be conducted under the rules of the Transportation Arbitration And Mediation PLLC (TAM), the American Arbitration Association (AAA), or Transportation ADR Council, Inc. (ADR), at BROKER's sole discretion. Arbitration proceedings shall be started within eighteen (18) months from the date of delivery or scheduled date of delivery of the cargo, whichever is later. Upon agreement of the Parties, arbitration proceedings may be conducted outside of the administrative control of the TAM, AAA, or ADR. The decision of the arbitrator(s) shall be binding and final and the award of the arbitrator(s) may be entered as judgment in any court of competent jurisdiction. The prevailing Party shall be entitled to recovery of costs, expenses and reasonable attorneys fees as well as those incurred in any action for injunctive relief, or in the event further legal action is taken to enforce the award of the arbitrator(s). Arbitration proceedings shall be conducted at the office of TAM, the AAA or the ADR nearest Dallas, Texas or such other place as mutually agreed upon in writing by the Parties or directed by the acting arbitration association. Provided, however, either Party may apply to a court of competent jurisdiction for injunctive relief. Venue for any such action against BROKER shall be Dallas County, Texas. Unless preempted or controlled by Federal law and/or regulations, the laws of the State of Texas shall be controlling. The arbitration provisions of this Section 4.F shall not apply to enforcement of the award of arbitration.

H. NO BACK SOLICITATION:

I. CARRIER shall not, directly or indirectly, solicit any shipment(s) from any shipper, consignor, or consignee, or other customer of BROKER, when a shipment of the shipper, consignor or consignee, or other customer of BROKER was first tendered to CARRIER by BROKER, or when such shipper, consignor or consignee was first introduced to CARRIER and BROKER.

II. In the event of a breach of paragraph H.i. of this Section 4 of this Agreement, BROKER shall be entitled, for a period of two years following delivery of the last shipment transported by CARRIER under this Agreement, to a commission of thirty percent (30%) of the gross transportation revenue including accessorial charges (as evidenced by freight bills) received by CARRIER for the transportation of each such shipment as liquidated damages. Additionally, BROKER may seek injunctive relief and in the event BROKER is successful, CARRIER shall be liable for all costs and expenses incurred by BROKER, including, but not limited to, cost, expenses and reasonable attorneys fees.

I. CONFIDENTIALITY:

I. In addition to confidential information protected by law, statutory or otherwise, the Parties agree that all of their financial information and that of BROKER's shipper customer(s) and the consignee(s), including but not limited to freight rates, amounts received for motor carrier services, amounts of freight charges collected, freight volume requirements, as well as personal customer information, customer shipping or other logistics requirements shared or learned between the Parties and BROKER's shipper customer(s), the consignor(s) and/or the consignee(s), shall be treated as confidential, and shall not be disclosed or used by a Party for any reason without the prior written consent of the other Party.

II. In the event of violation of paragraph I.I. of this Section 4 of this Agreement, the Parties agree that the remedy at law, including monetary damages, may be inadequate and that the Parties shall be entitled, in addition to any other remedy they may have, to an injunction restraining the violating Party from further violation of this Agreement in which case the violating Party shall be liable to the prevailing Party for all costs and expenses incurred by the prevailing Party, including but not limited to costs, expenses and reasonable attorney's fees.

J. MODIFICATION OF AGREEMENT: This Agreement may not be amended, except by mutual written Agreement of the Parties.

K. NOTICES:

I. All notices required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment; or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested. In each case to the following addresses, facsimile numbers or email addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, email address or person as a party may designate by notice to the other Party):

|  |  |
|---|---|
| BROKER: | Honor Worldwide Logistics, LLC |
| Attention: | John A. Onorato |
| Address: | 5200 Hollister St., Ste. 101 |
| Houston, TX 77040 | |
| Fax no.: | 713-895-3142 |
| Email address: | customerservice@honorww.com |

CARRIER: _Art Heavy Haul Inc._

Address: _425 W Factory Rd_
_Addison, IL 60101_

Fax no. _630-333-4168_
Email address: _M.Brad@ArtHeavyHaul.com_

 II. The Parties shall promptly notify each other of any claim that is asserted against either of them by anyone arising out of either Party's performance of this Agreement.

 III. Notices sent as required under paragraphs K.I and K.II of this Section 4 of this Agreement to the addresses shown in this Agreement shall be deemed sent to the correct address, unless a Party has notified the other Party in writing of any change in address.

L. CONTRACT TERM: The term of this Agreement shall be one (1) year from the date of this Agreement; and thereafter this Agreement shall automatically be renewed for successive one (1) year periods. The term of this Agreement may be terminated by BROKER: (I) upon thirty (30) days prior written notice, at any time, including the initial term, and (II) upon written notice, at any time, including the initial term, if CARRIER has breached this Agreement, provided that BROKER has given written notice of the breach to CARRIER, and CARRIER has failed within twenty (20) days thereafter to cure the breach. The term of this Agreement may be terminated by CARRIER, upon written notice, at any time, including the initial term, if BROKER has breached this Agreement, provided that CARRIER has given written notice of the breach to BROKER, and BROKER has failed within twenty (20 days) thereafter to cure the breach. In the event of termination of this Agreement for any reason, the Parties shall be obligated to complete performance of any work in progress in accordance with the terms of this Agreement.

M. FORCE MAJEURE: LEGAL RESTRAINT: If either BROKER or CARRIER is prevented from or delayed in performing any of its obligations under this Agreement by reason of statues, regulations or orders of a governmental entity (including actions taken by a court or by law enforcement officials), or because of war, terrorism, acts of God, labor disturbances, civil unrest, or any cause beyond the reasonable control of such Party, that Party shall not be liable to the other Party for damages by reason of any delay or suspension of performance resulting from such legal restraint or force majeure. The Party invoking this Section, however, shall furnish the other Party with notice of such legal restraint or force majeure no later than the day after the onset of the condition preventing or delaying performance.

N. SEVERANCE: In the event any of the provisions of this Agreement are determined to be invalid or unenforceable, no other provisions shall be affected and the unaffected provisions shall remain valid and enforceable as written.

O. SURVIVAL: If the term of this Agreement expires or if this Agreement is terminated, the representations and the then accrued rights and obligations of the Parties shall survive such expiration or termination.

P.  COUNTERPARTS: This Agreement may be executed in any number of counterparts, each of which shall be deemed to be a duplicate original of this Agreement.

Q.  FAX OR EMAIL CONSENT: The Parties to this Agreement hereby authorize each other to send faxes or emails to each other at the fax numbers and email addresses described below, (or otherwise as may be amended in writing from time to time).

R.  ENTIRE AGREEMENT: This Agreement contains the entire understanding and contract of the Parties and supersedes all verbal or written prior agreements, arrangements and understandings of the Parties relating to the subject matter stated under this Agreement. The Parties further intend that this Agreement constitutes the complete and exclusive statement of the entire understanding and contract of the Parties, and that no extrinsic evidence may be introduced to reform this Agreement in any judicial or arbitration proceeding involving this Agreement.

IN WITNESS WHEREOF,    we have executed this Agreement as of the date and year first shown above.

| Honor Worldwide Logistics, LLC (BROKER) | *ART Heavy Haul INC* (CARRIER) |
|---|---|
| Authorized Signature | Authorized Signature *[signature]* |
| Printed Name: | Printed Name: *Brad Morris* |
| Company Address: | Company Address: |
| 5200 Hollister St., Ste 101 | *425 W Factory RD* |
| Houston, TX 77040 | *Addison, IL 60101* |
| Phone: | Phone: *630-628-2290 ext 108* |
| 713-895-3175 | |
| Fax No: | Fax No. |
| 713-895-3142 | *630-333-4168* |
| Email address: | Email address: |
| customerservice@honorww.com | *M.Brad@ARTHeavyHaul.com* |

Honor_000010